Killits, J.
This case was begun to secure partition of the premises'.in the village of Bryan, known as Long’s Block. .This is a three-roomed and three storied business .property built by William IT., George E., and John W. Long. William conveyed his undivided ■ interest to his daughter, the plaintiff. John W. Long died in 1905, *114 testate, devising Iris interest to Iris widow, the defendant Eugenia. George E. Long died in 1898, testate, leaving his interest to his widow, the defendant Harriet, for life, with remainder in trust for the benefit of his son Parker. The will of George E. Long w.as construed by this court in -the case of Gillis v. Long, 8 N. P.—N. S., 1, and our decree therein, having been followed on appeal by the circuit court, is now under consideration in the Supreme Court. The question in that case, principally considered, was whether his father’s will was sufficient to clothe Parker with a devisable interest at his death, which took place in November, 1902, before he had entered into the enjoyment of any benefit from its provision. The controversy was between Parker’s devisee, his mother Harriet, and Anna Tressler Long, widow of Parker’s brother John, who died childless in 1906.
The plaintiff, in seeking partition in the action now pending, makes Anna Tressler Long a party to this action upon the averment that the latter still claims an interest in the property, notwithstanding the decree adverse to her in Gillis v. Long, supra, and Anna, probably not adverse -to a retrial of her case, promptly comes in with a cross-petition in which she -asserts that all questions between her and her mother-in-law were not fought out in the former case, but that one very significant feature was not before the court at all or in anj^ form when Gillis v. Long was heard and decided. In her cross-petition she avers that Parker W. Long died childless and unmarried-in November, 1902, leaving a will in which his mother, the defendant Harriet, is the sole devisee and legatee; that the fact of the leaving of such will and its existence was thereafter at all times in the knowledge of Harriet who had the instrument at all times in her power to control, and that she, without any excuse for the delay, failed to offer or cause the instrument to be offered for probate until after the expiration of three years from Parker’s decease. Upon this situation, Anna asks that the penalty of forfeiture of her devise, as provided by Section 5943, Revised Statutes, be imposed upon Harriet, and that she, Anna, be decreed to be the owner' of a life estate upon'Harriet’s life estate in the premises, pursuant to the provisions of Section 4158, Revised Statutes, on the proposition that Harriet’s forfeited interest descended as intestate prop *115 erty of Parker to his brother John, and, upon the latter’s death intestate and childless, to his heirs at law, with a life estate to her as the widow. Harriet joins the isue with a general denial, and a plea of res judicata, and, in an amendment allowed to meet the testimony, by a claim that the circumstances under which the will was left off probate for more than three years preclude Anna, as John’s representative, from insisting upon the penalty of Section 5943, Revised Statutes.
Since the summer of 1906 no less than eight actions have been begun in this court involving directly or very closely the domestic affairs of this branch of the Long family, which has long been prominent in the life of the’village and county. Elements both tragic and highly dramatic have entered into these eases and their development, with here and there a touch of comedy lighting up the general gloom. The circumstances have been exploited, with large headlines, in the local and neighboring newspapers, and have been the topic of much local discussion for three winters, out of which a great deal of store-box law has been evolved, while the ingenuity of the judge of this court has been greatly taxed, and perhaps strained, in devising evasions which might preserve our standing for courtesy and save the necessity of unjudicial opinion.
When, therefore, we found counsel for Harriet claiming that her technical defense of former adjudication was without flaw and that at the same time she had a good defense upon the merits, we felt that the purely technical question of res judicata should stand aside until the merits were considered, upon the theory that it would be better that Harriet Long should hold t.bia property, if at all, on the merits, if possible, rather than by reason of a technicality.
Although it is hoped that Section 5943, which, by the way, has been the law of Ohio for sixty-nine years, may not be as much out of mind of the bar generally as it seemed to have been with counsel in Long v. Gillis, we still think it advisable to quote it here:
“No lands, tenements, or hereditaments, shall pass to any devisee in a will, who shall know of the existence thereof, and have the same in his power to control, for the term of three years, un *116 less, within that time, he shall cause the same -to be offered for, or admitted to, probate; and by such neglect, the estate devised to such devisee shall descend to the heirs of the testator.'”
■ This law, although’ enacted in 1840, has received the most meager construction. The Supreme Court, in Carpenter v. Denoon, 29 Ohio St., 379, says that it does not apply to cases of neglect in causing a copy of a will probated elsewhere to be probated in the county where the devised property may be situated, and, speaking of the operation of the statute, the court says, page 393, that, "under these provisions, a devise lapses by neglect to cause a known will to be offered for or admitted to probate”; and in Avery v. Howard, 7 N. P.—N. S., 97, the court observes that the statute is intended to aid in prompt administration, and that, where there were two -wills, in the custody of the same person, who offers the latest one, which is set aside in contest proceedings, the custodian does not lose his devise in the earlier one if he offers it for probate promptly after the latter is avoided, although more than three years may have elapsed.
These cases afford very little light On the law’s construction. However, that task does not seem to bé a very difficult one. In the first place, it would seem that the statute must- be construed strictly, and applied only in cases where its evident purpose demands that it be taken into account. It interferes with the general right testator has to pass his property, is a restriction upon the operation of testator’s lawful purpose, and through no fault of his, nor because of any circumstances which he may control. He may have made no provision for a custodian, yet, through this- statute, a cherished purpose, commendable in hint and meeting the very highest legal and.moral duty, may be brought to-naught. Secondly, it is highly punitory in its effect, and is therefore subject to the same rule of strict construction as any other statute providing a. penalty or forfeiture.
Again, it must be observed that it is not a self-operating statute; that is, it does not declare a rule of property, but an action is necessary to effect the forfeiture it provides for. This feature is manifest from the fact that it is not delay and lapse of time alone which start its operation, but a state of facts addi *117 tional must be established, which situation can be brought about only by a proceeding in court. The identity of the tardy custodian, or the party with “power to control,” with the devisee must be seen and declared by a court competent to entertain such an issue of fact. A cardinal rule of construction is that all correlated parts of a statute must be construed together, where* fore it would seem that the use of the significant word “neglect,” which dominates the last phrase, is of force in the interpretation, and that delay even of the party at whom the statute points, to be -fatal, must have in it some degree of affirmative, if innocent and ignorant, carelessness. It is observed by the Probate Court of Hamilton County, in admitting Blymyer’s will to probate (Blymyer, In re, 7 N. P., 591), that this statute does not affect the right to probate of a will under its provisions, and we think that it is clearly the law that -the statute could not have been invoked by any person interested to defeat the probate. The functions of the probate court in determining whether the will of a deceased resident within its jurisdiction shall be admitted to probate are limited to a consideration whether the-alleged testator was of full age and of sound mind and free from restraint, and whether the instrument has been duly attested and executed. There is no room here to consider how the wi’l is to operate (Section 5929). If'we are right as to this particular matter, then, a fortiori, an -action is necessary and a decree of court, before any devisee under such will is affected by Section 5943, Revised Statutes, otherwise the probate record would be a cloud on the title of the forfeited devise.
It is perhaps also here profitable to consider the purpose and object of the statute, and as to that, for want of any previous adjudication, we are left to free judgment, but it-would seem that the law’s object, in addition to the penalty for careless delay, is to secure prompt administration and to protect the title and innocent parties dealing therewith, and we are not left altogether to our own conjecture touching -this question, for the Supreme Court, in Carpenter v. Denoon, 29 Ohio St., 379, 394, states that such is the object and purpose of the similar Section 5967, dealing with the effect of delay in getting into .the local record a will of a non-resident of the state.
*118 All these considerations are of importance both in connection with the facts and as touching the right of Anna Tressler Long to demand enforcement of this forfeiture, for the really interesting question is not so much whether Mrs. Harriet Long is technically within the statute, as granting that otherwise she is subject to its drastic action, whether or not her daughter-in-law is in position to profit thereby. Plainly, as conceded in argument, Anna has no standing here save as, within the provisions of Section 4158, Revised Statutes, she is entitled to a life estate in such lands as her childless and intestate husband, John P. Long, was seized of in fee at his death. She, therefore, can do only what John P. Long in his lifetime could have done, and if he could not have secured -the enforcement of this statute against his mother at anytime before his death, his widow can not.
Proceeding now to a consideration of the undisputed facts, we notice, first, that in no way has any embarrassment come to any person because of this delay. The land in question was and still is burdened with a life estate in Mrs. Harriet Long by virtue of the 'will of her husband, and Parker at his death had not come into the enjoyment of his estate therein, nor has there been any attempt at administration of Parker’s estate, nor any creditor who is shown to be standing with an unpaid claim. There were but two children of George E. Long living at his death, Parker and John. Parker died a bachelor, at the age of thirty-six, .and after a life of more or less dissipation, at his mother’s house where he lived, and without having ever, in his mature years, contributed much, if anything, to her comfort support or peace of mind. The mother was seventy-four years old when he died, and thenceforth lived alone. John was then thirty-four years old, without outwardly at least, any unpleasant or immoral habits. He was married and in the prosecution of a prosperous and honorable business, in which it seemed that he was maintaining the best traditions of the family. He and his mother lived in the same village, within a very short distance from each other, and until a short time before his death and indeed until after three years had passed from Parker’s death, he was almost a daily visitor at her house. He transacted all her business, paid her taxes, looked after insurance, collected her *119 rents, paid her bills, and cared for her repairs, and kept in his safe her valuable papers. There was between this aged woman and her only surviving child the relation of confidential dependence on her part upon him for guidance in every affair in any way different from the daily round of purely domestic and social duties.
Parker made the will in July before his'death in November. He told his mother that he intended her to have all his property, and asked her to call an attorney to prepare the document. She acceded to this request and the instrument was then made and executed in her house to her knoweldge, she calling in a neighbor to join the lawyer as a witness. The will was left in Parker’s hands after its execution. There is some dispute whether or not it was read to the testator in the mother’s presence, the attorney averring that it was not, and the other witness being of the opinion that it was so read, but this is immaterial, because it is admitted that Mrs. Long knew of its execution and • that she was the beneficiary. During the summer of 1902, Parker was able to be up, and several times his brother John took him up to the store in a wheel chair. John knew of the fact that Parker had made a will, but it is not conceded that he knew of its provisions. Mrs. Harriet Long produced the will for probate about four months after John disappeared, and, indeed, after his death, although that fact was not then known. There being no next of kin except the mother within the county, no notice, except to her, was given. Some time after Parker’s death, but within the three years thereafter, John employed the attorney who wrote the will to assist in terminating the administration of the father’s estate, and, as John and his mother and the attorney in question were proceeding from the court house on the completion of this business, Mrs. Harriet Long, in the presence and hearing of her son, asked the attorney if the will should not be' probated, and she was then and there, in the like presence and hearing of John, advised that probate was not necessary. Mrs. Long was then at least seventy-six years old and her son thirty-six, with the confidential relation described above still subsisting between them.
Assuming that these were all the facts, would John P, Long, if alive, have any standing in any tribunal to enforce in his sole *120 behalf a.forfeiture against the mother for delaying the probate of his will? It may be assumed as a fact proven that each of them was equally ignorant of the law, and that John’s neglect to advise his mother or to look after the matter himself was without design, but it shocks the conscience to say that this aged lady should lose to the son upon whom she leaned for the transaction of all business because she. did not follow an unknown law and guard herself against such a result.
However, referring a judgment that John P. Long could not have this forfeiture enforced to any special principle of equity jurisprudence is not easy. At first, it .seemed that the doctrine of equitable estoppel would apply, and the definition thereof given by Judge Pomeroy, Eq. Jurisp., Section 804, is broad enough to cover this ease, but, beyond the definition are a set of elements essential to its application, each of which must be present as inflexibly as if'the common law had established the doctrine, and, because it must be conceded that both John and his mother were equally chargeable with at least constructive knowledge of the law in question, and that neither acted consciously upon the subject, so that the test of knowledge and ignorance on the part of John and the mother, respectively, and of intention by John alone, may not be applied, the principle is seen not to reach the situation. But, unless equity, which had its birth in an effort to mitigate the hardships sometimes resulting from the unyielding rules of common law, has itself become rigid and unbending, it must contain some other method of doing righteousness in a situation of this kind, and we suggest that such is found in doctrine of constructive fraud.
It is too well settled to need citation that equity will not per-' mit a result to be worked out within its jurisdiction which has the effect of fraud upon the loser. Pomeroy, Eq. Jurisp., Section 922:
“The term ‘constructive fraud’ is not a very appropriate one, but has been used so long that any attempt to substitute another in its place would be useless. It is important, 'however, to form an accurate motion of the meaning given it in equity, and the peculiar element or criterion- which distinguishes the various classes of cases belonging to it. * * Constructive fraud is simply a term applied -to a great variety of transactions, hav *121 ing little resemblance either in form or nature, which equity regards as wrongful, to which it attributes the same or similar effects as those which follow actual fraud, and for which it gives the same or similar relief as that granted in cases of real fraud. It covers different grades of wrong. It embraces contracts illegal, and therefore void at law as well as in equity; transactions voidable in equity because contrary to public policy; and transactions which merely raise a presumption of wrong, and throw upon the party benefited the burden of proving his innocence and absence of fault.”
And, again, Sections 955 and 956:
“It is of the utmost importance to obtain an accurate conception of the exact circumstances under which the equitable principle now to be examined is applied; 'otherwise the entire discussion of the doctrine will be confused and imperfect. * * * The single circumstance now to be considered is the existence of some fiduciary relation, some relation of confidence subsisting between the parties. No mental weakness, old age, ignorance, pecuniary distress, and the like, is assumed as an element of the transaction; if any such fact be present, it is incidental, not necessary, immaterial, not essential. Nor does undue influence form a necessary part of the circumstances, except so far as undue influence, or rather the ability to exercise undue influence, is implied in the very conception of a fiduciary relation, in the superiority occupied by one of the parties over the other, contained in the very definition of that relation. This is a most important statement, not a mere verbal criticism. Nothing can tend more to produce confusion and inaccuracy in the discussion of the subject than the treatment of actual undue influence and fiduciary relations as though they constituted one and the same doctrine.
“It was shown in the preceding section that if one person is placed in such a fiduciary relation toward another that the duty rests upon him to disclose, and he intentionally conceals a material fact with the purpose of inducing the other to enter into an agreement such concealment is an actual fraud, and the agreement is voidable without the aid of any presumption. We are now to view fiduciary relations under an entirely different aspect; there is no intentional concealment; no misrepresentation; no actual fraud. The doctrine arises from a very different conception and existence of a fiduciary relation. While equity does not deny the possibility of valid transactions between the two parties, yet because every fiduciary relation implies a condition of superiority held by one of the parties over the other, in every transaction between them by which the superior party obtains *122 a possible benefit, equity, raises a presumption against its validity, and casts upon that party the burden of proving affirmatively its compliance with equitable requisites, and of thereby overcoming the presumption. * * ® Courts of equity have carefully refrained from defining the particular instances of fiduciary relations - in such a manner that other and new cases might be excluded. It is settled by an .oyerwhelming weight of authority that -the principle extends to every possible ease in which a fiduciary relation exists as a fact, in which there is confidence reposed on one side, and the resulting superiority and influence on the other. The relation and the duties involved in it need not be legal; it may be moral, social, domestic, or merely personal. ’ ’
It would be both tedious and unprofitable to discuss the numerous cases in which th'ese principles have been applied. Generally they deal with the relation of principal and agent, attorney and client, parent and child, and child and parent, when the latter is aged or has put himself upon the advice and guidance of his child. Pomeroy says, Section 959, that “the underlying thought is that an agent should not unite his personal and representative characters in the same transaction; and equity will not permit him to be exposed to the temptation or brought into a situation where his own personal interests conflict with the interests of his principal, and with the duties which he owes to his principal, ’ ’ and this same idea, varied according to the varying situations, applies in all cases of fiduciary relationship of whatever character, but, as the distinguished authority says in the section quoted above,^ Section 956, courts of equity have designedly left the principle flexible, to be applied to new conditions which may arise which partake of the nature of the decided cases, that it may work out equity in all the varying conditions of life wherein it may be applicable.
Our own Supreme Court (Stivens v. Summers, 68 Ohio St., 421, 441), defines that situation as constructively fraudulent which would, “either in the particular case or in common experience, lead to consequences equivalent to those following actual fraud,” and it does not seem difficult to see that to permit John P. Long to profit by his mother’s delay under the circumstances shown above would be to permit consequences to her, which he owed to her to prevent, as deplorable as if he were guilty of actual fraud. *123 If, as Pomeroy says in Section 955, quoted above, no situation of actual inferiority, as old age, ignorance or the like, is needed to make these principles applicable, but that they operate when the parties are on terms of equality of opportunity, then so much more does a case demand their application in which are shown facts such as we have before us.
But if these undisputed facts are not enough to show how violative of equitable principles it would have been to permit this forfeiture to John P. Long, attention is called to the facts over which there is more or less controversy. The burden of proof is of course upon Anna Tressler Long to prove that the-will was either in the custody of her mother-in-law for the fateful period, or within the latter’s power to control. To remove that burden, it was shown that her attorney and her agent, a Mr. Hamilton, visited Mrs. Harriet Long at her house, two or three months ago, and there tried her for information as to the whereabouts of the will during the years prior to probating. It can not be gainsaid that the question put to her had a sinister sound, and it was obvious that it was framed with a view of diverting her mind from the real object of the inquiry, and it was an unconscious tribute on the part of these astute gentlemen to Mrs. Long’s mentality, even if she were then eighty years old, that they felt the necessity of putting their question in disguise. It was, in substance, whether she was sure, that the will had not been tampered with before it was offered for probate and what assurances on that point could she give these anxious seekers for the truth. They say that she calmly replied at length that it had been in her care ever since it was made until taken to the probate office, and hence could not have been meddled with.° She says, and in this she is supported by a young lady resident with her, that she resented the question as imputing dishonesty to her, and replied with some heat -that her family was not in the habit of indulging in dishonesty, and that from the time she got the will until it had been taken to the court house she had guarded it from all harm.
We will not undertake the delicate task of differentiating between the credibilities of these two conflicting reports of this conversation, save to say that it seems very likely that a question *124 put in that way should provoke some heat in the- interrogated person, and, as it was so put with a view to throw her off her guard, it would be reasonable not to hold this old lady, talking to her antagonist’s enunissaries, .to the full consequences of her unguarded reply.
Every lawyer who has ever conducted an examination- of a witness knows that many times compromising answers are obtained to uncomprehended questions, wherefore the practice allows re-examination upon cross-examination, an opportunity that was not vouchsafed Mrs. Long for her protection when this examination of her was had. In explanation of her answer, Mrs. Long says that she never saw or had possession of the will until October, 1906, within a month before it was offered for probate and that she never had the will in her custody and never knew definitely where it was until this same date; that at this time, John having disappeared a month or two before, the store still being conducted by his employes, she took possession of the store under her chattel mortgage, and sold it thereunder, and then removed from the safe a tin deed box which John had provided for the safe-keeping of her'papers, which he held for her, and, opening the box at her residence found the will therein with her policies of insurance and other documents.
Counsel for Mrs. An'na Long introduced several witnesses by whom it was proven that the mother had frequently dealt with John at the store touching her affairs at times when this box was in view as having been consulted for the papers it contained, and, although they contradict the old lady as to the fact of her having done business herself with reference to that box on such occasions, these witnesses do corroborate her in.the position that the box was the receptacle, in John’s safe, of her valuable documents. Assuming that her testimony is true, and we see no reason why so reasonable and likely a story might not be true except the disputed statement made by her to Anna’s agent and attorney, then, if we may hold Mrs. Long to an accountability as custodian of this will or as maintaining a dominance over it, we have John, the only party to benefit by keeping it off probate for more than three years, participating in *125 this delay. It would seem that a statement, only, of this fact is enough to show that he was never in position to profit thereby.
It must not be. understood that the court is losing sight of the doctrine that equity seldom if ever interferes to prevent the enforcement of a statutory forfeiture. Our position Is not out of harmony with that principle. We hold that equity, while it may not relieve against a statutory forfeiture, has the power to discriminate between the parties who seek its enforcement, and can say that the beneficiary of a forfeiture may have stood in such a relation to the forfeiter as to have deprived himself of the opportunity to insist upon the right because the exercise thereof by him would be tantamount to a fraud upon the forfeiter.
So we say, here, that John P. Long, who lived nine months longer than three years after Parker’s death, and who did business for himself and for his mother for several yearS'before and for seven months after his mother had incurred the penalty, if at all. would not be permitted to enforce this statute against Harriet Long, if living, and, of course, if John were unable to take advantage of it, his widow, Anna Tressler Long, whose position in this case is wholly representative and substitutional, may not, either.
Having reached this conclusion on the merits, it is not profitable to consider the question of res judicata, so ably argued by counsel on both sides, nor the other purely technical proposition that equity, generally, never aids in the enforcement of a forfeiture. Another interesting .question occurs to the court, not argued, and that is, whether the limitation of Section 4983,'Re-vised Statutes, does not apply to actions under Section- 5943. That section provides that an action for the enforcement of a penalty or a forfeiture shall not be commenced after the expiration of one year. If that statute of limitations applies, and we see no reason why it does not, Mrs. Anna Long has been barred for more than two years.